**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

CHASE JARVIS; CHASE JARVIS INC., a
Washington Corporation,
        *Plaintiffs-Appellants,*

        v.

K2 INC., a Delaware Corporation;
K-2 CORPORATION,
        *Defendants-Appellees.*

No. 05-35609

D.C. No.
CV-03-01265-TSZ

OPINION

Appeal from the United States District Court
for the Western District of Washington
Thomas S. Zilly, District Judge, Presiding

Argued and Submitted
February 7, 2007—Seattle, Washington

Filed April 30, 2007

Before: Robert R. Beezer, Raymond C. Fisher and
Richard C. Tallman, Circuit Judges.

Opinion by Judge Fisher

**COUNSEL**

Katherine Hendricks (argued) and J. Bowman Neely, Hendricks & Lewis, Seattle, Washington, for the plaintiffs-appellants.

Shannon L. McDougald (argued), Seattle, Washington, and Jennifer Bell, Ryan McBrayer and Matthew Diggs, Perkins Coie, LLP, Seattle, Washington, for the defendants-appellees.

**OPINION**

FISHER, Circuit Judge:

Chase Jarvis is a professional photographer who created several thousand photographic slides over a three-year period for K2, Inc. ("K2"), a maker of outdoor sporting goods. Unfortunately, this relationship eventually soured. Jarvis sued K2, alleging that it infringed his copyrights in his photo-

graphic images, lost many of the slides that he delivered and repeatedly failed to credit him when it used his images. The district court agreed that K2 was liable under each of these theories and awarded damages to Jarvis. However, the district court found that 24 of Jarvis' images — contained in four K2 collage advertisements that combined Jarvis' images with other images and graphics — were not infringed because the ads were covered by the collective works privilege of 17 U.S.C. § 201(c).[1] Jarvis now appeals the district court's damages awards and its ruling as to the collage ads' privileged status.

We hold that the district court did not clearly err in any of its damages calculations. It employed reasonable estimates of the market value of the infringed images as well as the business lost by Jarvis because of the lost images and failures to credit him. We do not agree with the district court, however, that the 24 images in the collage ads were privileged under § 201(c). The collage ads were derivative rather than collective works because they transformed Jarvis' original images into new promotional posters.[2] The collective works privilege therefore did not apply to the ads, and their online display after K2's term of use had expired infringed Jarvis' copyrights in the underlying images. Accordingly, we reverse the district court's ruling as to § 201(c) and remand for determinations of willfulness, actual and statutory damages and attorney's fees with respect to the collage ads.

## I. BACKGROUND

### A. Factual History

Jarvis is a professional photographer who specializes in outdoor sports images. K2 is a corporation that sells outdoor

---

[1] Unless otherwise noted, all statutory citations in this opinion are to Title 17 of the United States Code.

[2] The collage ads are appended to this opinion as Appendix A.

sporting goods such as skis, snowboards, skates and bikes. Jarvis and K2 entered into five separate agreements from 1999 to 2002, pursuant to which Jarvis took photographs for K2 and sent it the resulting slides in exchange for compensation. Each delivery of slides was accompanied by a delivery memorandum that, among other things, stated that "[l]oss or damage of any image will result in a $1,500 fee per image, as set forth by industry standards."

Three of the five agreements between Jarvis and K2 were oral. Of greater relevance here, two agreements were written by Jarvis and entered into, respectively, on October 6, 2000 ("2000 Agreement") and December 13, 2001 ("2001 Agreement"). Both of these agreements authorized K2 to "publish images" provided by Jarvis in K2's "brochures, print advertisements, trade show display booths, posters, and electronically for the web so as to market [its] business." All uses of Jarvis' images had to include an attribution credit. K2's "photo use rights" in the 2000 Agreement images were to "extend through the 2001-02 ski year or one year from [the images'] delivery date," while its rights in the 2001 Agreement images were to last "for the 2002-03 ski season, ending in May 2003."[3] There was an integration clause in both agreements stating, "This Agreement constitutes the entire agreement of the parties as to the subject matter hereto." Jarvis delivered 2,516 slides to K2 and received $10,000 under the 2000 Agreement, and delivered 1,210 slides and received $7,200 under the 2001 Agreement.

In total, Jarvis provided 4,147 slides to K2, the vast majority of them pursuant to the 2000 and 2001 Agreements. K2 lost 396 of these slides and hence was unable to return them to Jarvis. K2 also failed to provide a photo credit to Jarvis in 105 images that it used, and miscredited one of his images to

---

[3]The alternative proviso in the 2000 Agreement that K2's rights to use Jarvis' images were to last "for one year from date of delivery" is immaterial to our decision.

another photographer. Finally, 82 of Jarvis' images were used by K2 after the underlying licenses had expired or by third parties to whom K2 had improperly provided the images. Twenty-four of the 82 images were incorporated into four "collage" advertisements that were initially published as magazine inserts during the time period the 2001 Agreement authorized K2 to use the images. The ads combined edited versions of Jarvis' images with other images, marketing graphics and promotional slogans. After the contractual term limit for using Jarvis' images had expired, K2 scanned the collage ads and displayed them on its website.

## B. Procedural History

Jarvis filed his action against K2 in June 2003. The district court granted partial summary judgment against K2 on Jarvis' copyright infringement, breach of contract and conversion claims in September 2004. The court later bifurcated Jarvis' claims, ordering the Lanham Act and damages issues to proceed to trial but staying the vicarious copyright infringement, breach of contract and conversion claims. Upon conclusion of a bench trial in March 2005, the court entered comprehensive findings of fact and conclusions of law. Although the court ruled in Jarvis' favor in many respects and awarded him damages, Jarvis takes issue with the court's ruling as to the collective works privilege as well as its determination of damages.

The district court's award of damages for the 396 unreturned slides totaled $199,000 ($500 each for the 395 unidentified slides and $1,500 for one slide identified as having been created for K2 Bike). Damages for the 105 failures to credit and one miscredit totaled $11,400, based on a rate of $50 per failure for online use, $200 per failure for print ads and $300 per failure for media use. And damages for 58 infringements of Jarvis' copyrights totaled $40,107, based largely on a fair market value of $461 each for images used online.[4]

---

[4]As noted above, 82 images were used by K2 after its licenses had expired or by third parties to whom K2 had improperly provided the

The district court's damages awards were premised on several legal and factual determinations, two of which are particularly relevant here. First, the court found that the 2000 and 2001 Agreements were fully integrated contracts, and that Jarvis' delivery memos specifying a $1,500 liquidated damages amount for lost or damaged slides were simply proposed contract modifications that K2 never accepted. Second, the court ruled that K2's collage ads — which contained 24 images that would otherwise have infringed Jarvis' copyrights — constituted collective works and thus were privileged under § 201(c). According to the court, the time limits for usage specified in the Agreements did not obviate the rights conferred by § 201(c), and the transfer of the ads from print to electronic form did not transform them into unprotected new works. Importantly, by finding the ads privileged under § 201(c), the court negated the effect of Jarvis' registration of his copyrights in some of the 24 images in the collage ads before K2's alleged infringement. Otherwise, Jarvis could have elected statutory damages and potentially received attorney's fees for those infringements.

Judgment was entered in May 2005, and Jarvis timely appealed.

## II.  STANDARD OF REVIEW

The district court's findings of fact are reviewed for clear error whereas its conclusions of law are reviewed de novo. *See Zivkovic v. S. Cal. Edison Co.*, 302 F.3d 1080, 1088 (9th Cir. 2002). Actual damages awards are reviewed for clear error. *See Frank Music Corp. v. Metro-Goldwyn-Mayer, Inc.*, 772 F.2d 505, 513 (9th Cir. 1985). Whether a contract is inte-

---

images. However, the court found that 24 of these images that were used in the collage ads were not infringements because the ads were privileged under § 201(c). The infringement damages were for the remaining 58 images.

grated is a factual determination that we review for substantial error. *See Sierra Diesel Injection Serv., Inc. v. Burroughs Corp.*, 890 F.2d 108, 112 (9th Cir. 1989).

## III. DISCUSSION

### A. The Collage Advertisements

Jarvis contends that the 2001 Agreement, which applied to all the images in the collage ads, did not permit the images' use by K2 in any capacity after May 2003. He also argues that the district court erred in ruling that K2's collage ads were collective works protected by § 201(c) and hence not infringements of Jarvis' copyrights. We agree with Jarvis on both counts, because the 2001 Agreement explicitly limited the term of use of Jarvis' images and because the collage ads were derivative works not protected by § 201(c). We do not reach Jarvis' other arguments for why the collective works privilege did not apply to the collage ads, namely that the ads were publicly displayed when they were posted on K2's website, that the ads were new works rather than revisions of the original magazine inserts and that § 201(c) had been circumvented by the 2001 Agreement. Accordingly, we reverse the district court's ruling that the collage ads were privileged collective works and remand for determinations of K2's willfulness, statutory and actual damages and attorney's fees.

### 1. The 2001 Agreement's Term Limit on Use

[1] The 2001 Agreement authorized K2 to "publish" Jarvis' images in media including K2's "brochures, print advertisements . . . posters, and electronically for the web so as to market [its] business." K2 therefore acted within its rights when it first created the collage ads and published them in the form of magazine inserts. K2 also would not have breached the Agreement had it scanned the ads and placed them online during the time period authorized by the contract. These uses were (or would have been) examples of the "publi[cation]" in

"posters" and "electronically for the web" contemplated by the Agreement.

**[2]** However, the 2001 Agreement also contained language that explicitly limited the time period during which K2 could use Jarvis' images. The "Usage" section of the contract specified that K2's rights were for "2002-2003, ending May 2003." Analogously, the "Term" section stated that K2's "photo usage rights apply for the 2002-03 ski season, ending in May 2003." This language plainly barred any use by K2 of Jarvis' images after May 2003. The usage term appeared twice in the contract, indicating its significance to the parties and rebutting any claim of inadequate notice. Moreover, the first statement of the term limit came directly after K2's photo use rights were described, while the second statement was located in a section labeled "Term" and referred specifically to K2's "photo usage rights." Given the Agreement's phrasing and structure, we conclude that the parties agreed that K2 would not use Jarvis' images in any capacity after May 2003. *Cf.* 1 Melville B. Nimmer & David Nimmer, Nimmer on Copyright § 3.07[B] (2005) [hereinafter Nimmer on Copyright] ("[I]f consent to use the underlying material is limited in time, then the owner of the derivative work may not exploit the underlying material beyond the time limit."). K2 notably fails to argue to the contrary, thus apparently conceding that its scanning and online display of the collage ads after May 2003 were not authorized by the Agreement.

## 2.   Derivative Versus Collective Works

Rather than claim that its post-May 2003 use of the collage ads was permitted by the 2001 Agreement itself, K2 relies on the collective works privilege of § 201(c). In relevant part, § 201(c) provides that, "[i]n the absence of an express transfer of the copyright or of any rights under it, the owner of copyright in the collective work is presumed to have acquired only the privilege of reproducing and distributing the contribution as part of that particular collective work, any revision of that

collective work, and any later collective work in the same series." K2 contends — and the district court agreed — that the collage ads were collective works and that even though the Agreement's usage term had expired, K2's scanning and online display of the ads were permissible uses under § 201(c). We disagree, because the ads were not collective works and thus not eligible for protection under § 201(c).**⁵**

**[3]** By its own terms, § 201(c) protects only collective works. "[T]he owner of copyright in the *collective* work is presumed to have acquired" certain rights. *Id.* (emphasis added); *see also* H.R. Rep. No. 94-1476, at 122 (1976), *as reprinted in* 1976 U.S.C.C.A.N. 5659, 5737 [hereinafter House Report] (referencing within section on § 201(c) the definition of "collective work" in § 101 and stating that § 201(c) "deals with the troublesome problem of ownership of copyright in contributions to collective works"). Collective and derivative works are both defined in § 101:

> A "collective work" is a work, such as a periodical issue, anthology, or encyclopedia, in which a number of contributions, constituting separate and independent works in themselves, are assembled into a collective whole.

> . . . .

---

**⁵**K2 asserts that Jarvis waived his derivative works argument because he did not raise it in the district court. However, as Jarvis points out, he had no reason to make the argument during trial because K2 did not assert the § 201(c) privilege until its closing argument. Furthermore, the district court explicitly found that the ads constituted collective works and the record is well-developed on this point. *See A-1 Ambulance Serv., Inc. v. County of Monterey*, 90 F.3d 333, 338 (9th Cir. 1996) ("Generally, in order for an argument to be considered on appeal, the argument must have been raised sufficiently for the trial court to rule on it."). At base, the question of whether the ads are derivative or a collective work is a mixed question of law and fact, and the relevant facts are clear and the parties have thoroughly briefed the issue.

A "derivative work" is a work based upon one or more preexisting works, such as a translation, musical arrangement . . . art reproduction, abridgement, condensation, *or any other form in which a work may be recast, transformed, or adapted.* A work consisting of editorial revisions, annotations, elaborations, or other modifications which, as a whole, represent an original work of authorship, is a "derivative work."

*Id.* (emphasis added); *see also id.* (defining a "compilation," of which collective works are a subcategory, as "a work formed by the collection and assembling of preexisting materials . . . that are selected, coordinated, or arranged in such a way that the resulting work as a whole constitutes an original work of authorship"); House Report at 122 ("[T]here is a basic distinction between a 'joint work' [by multiple authors], where the separate elements merge into a unified whole, and a 'collective work,' *where they remain unintegrated and disparate*.") (emphasis added); 1 Nimmer on Copyright § 3.02 ("[T]he originality called for in a collective work consists of the collection and assembling of pre-existing works, while derivative work originality lies in the manner in which a preexisting work is transformed . . . .").

**[4]** Under these statutory definitions, somewhat clarified by the legislative history, the collage ads were derivative rather than collective works. In accordance with his usual practice, Jarvis delivered all of his images to K2 in the form of identical square slides. The collage ads did not merely compile these slides as an album might, or as Jarvis' own website does. *See* Chase Jarvis Portfolio, http://www.chasejarvis.com/portfolio.html. To the contrary, the ads shrank, expanded, distorted, overlaid and otherwise edited the original images, while also combining them with photos taken by other photographers, additional graphics, the K2 logo and marketing slogans. In the "SP5" ad, for example, Jarvis' six photos are of all different shapes and sizes, one of them has a drawing

of a falling skier superimposed, there are at least six photos not taken by Jarvis in the arrangement and K2's logo and the slogan "Are You Listening" are prominently displayed. Similarly, in the "FT10" ad, seven of Jarvis' photos are arranged in trapezoidal wooden frames of different sizes along with more than a dozen other photos, and the words "Factory Team: Forty Years in the Making" appear in the upper right-hand section of the ad. The two remaining collage ads, "SP6" and "FT11," are strikingly similar, respectively, to the SP5 and FT10 ads; the SP6 ad is largely a vertically aligned version of the SP5 ad while the FT11 ad is largely a black-and-white version of the FT10 ad. *See* Appendix A.

**[5]** The changes to which K2 subjected Jarvis' images are examples of the "recast[ing], transform[ing], or adapt[ing]" and "editorial revisions, annotations, elaborations, or other modifications" that define derivative works. *See* § 101. Jarvis delivered the images to K2 in one form, and they were subsequently used in the collage ads in a quite different (though still recognizable) form. The ads did not simply compile or collect Jarvis' images, but rather altered them in various ways and fused them with other images and artistic elements into new works that were based on — i.e., derivative of — Jarvis' original images. These circumstances are somewhat similar to *Mirage Editions, Inc. v. Albuquerque A.R.T. Co.*, 856 F.2d 1341 (9th Cir. 1988), in which the appellant purchased art prints, encased them in a black plastic border, glued them onto ceramic tiles and then sold the resulting products. We held that "[b]y borrowing and mounting the preexisting, copyrighted individual art images . . . appellant has prepared a derivative work and infringed the subject copyrights." *Id.* at 1343. Even more analogous is *Greenberg v. Nat'l Geographic Soc'y*, 244 F.3d 1267 (11th Cir. 2001), in which the National Geographical Society's animated sequence of magazine cover images "repositioned Greenberg's photograph from a horizontal representation of the diver into a vertical presentation of that diver." *Id.* at 1274. According to the court, "[m]anifestly, this . . . arrangement of preexisting copyrighted photographs

constitutes . . . with reference to the Greenberg photograph, a derivative work." *Id.*

K2 fails to offer any case law in support of its position that the collage ads were collective works. It does argue that the collage ads "in no way transformed or altered [Jarvis'] preexisting photographs." However, even a cursory look at the ads — which "transformed or altered" Jarvis' photographs in a variety of ways — demonstrates the weakness of this claim. Counsel for K2 also emphasized during oral argument that the collage ads that appeared on K2's website were identical to the original magazine inserts. But this fact is irrelevant to our inquiry into the ads' nature. A derivative work remains derivative when it is scanned and placed online, just as a collective work would remain collective if it were transferred from one medium to another.

**[6]** We thus hold that the four collage ads were all derivative rather than collective works. Accordingly, when K2 scanned and placed the ads online after the usage period specified in the 2001 Agreement had terminated, the collective works privilege did not rescue them from infringement.[6]

### 3.   Remand

**[7]** Our holding as to the inapplicability of § 201(c) means that K2 infringed Jarvis' copyrights in the 24 images of his that were contained in the four collage ads. This increases the total number of images that K2 infringed from 58 to 82. We

---

[6]K2 is undisputably the owner of a copyright in the collage ads, which were creative works derived from copyrightable underlying material (Jarvis' photos). K2 could thus sue a third party that reproduced the ads even though it has been unable since May 2003 to take advantage of the ads itself. *See* 1 Nimmer on Copyright § 3.07[B] ("[E]ven if the owner of the derivative work is unable to exploit it because the new material is inextricably intermingled with the underlying material, still any unauthorized use by a third party of such new material will infringe the derivative work copyright.").

remand to the district court to determine what damages are appropriate for the 24 additional instances of copyright infringement. We also note that, unlike the other 58 infringed images, some of the images in the collage ads appear to have been registered by Jarvis before their infringement by K2 commenced. Jarvis may be entitled to statutory damages and attorney's fees under §§ 412, 504(c)(1) for these images, and he may attempt to show that K2's infringement was willful under § 504(c)(2).

On remand, the district court should determine which of the 24 images in the collage ads Jarvis registered and when he did so. The court should consider Jarvis' argument, which we do not address here, that he registered all 24 of the images (rather than the 16 the court originally designated). The court should then determine which of the images were registered before their infringement commenced, and address the issues of attorney's fees and statutory damages for those images (assuming Jarvis elects that option) and actual damages for the remainder of the 24 images. Finally, the court should determine whether K2 willfully infringed any of the images whose infringement began after their registration.

## B. Damages

Jarvis argues that all of the district court's damages calculations were flawed. We disagree and uphold the damages that the court awarded to Jarvis because of K2's copyright infringements, losses of images and failures to credit Jarvis. All three of these awards were based on reasonable estimates of loss and thus were not clearly erroneous.

### 1. Copyright Infringement

The district court awarded Jarvis $40,107 in actual damages for the 58 images whose copyrights K2 infringed. This figure was based largely on a fair market value estimate of $461 each for images used online, i.e., half the average mar-

ket value of the images used in print. Jarvis complains that in coming up with its damages award, the court erroneously relied on royalty-free rather than rights-managed rates and annual rather than monthly prices for use.[7]

[8] Actual damages for copyright infringement are governed by § 504(b), which states that "[t]he copyright owner is entitled to recover the actual damages suffered by him or her as a result of the infringement," but does not elaborate on how the damages are to be calculated. We have held that in situations where the infringer could have bargained with the copyright owner to purchase the right to use the work, actual damages are " 'what a willing buyer would have been reasonably required to pay to a willing seller for plaintiffs' work.' " *Frank Music Corp.*, 772 F.2d at 512 (quoting *Sid & Marty Krofft Television Prods., Inc. v. McDonald's Corp.*, 562 F.2d 1157, 1174 (9th Cir. 1977)). Excessively speculative claims of damages are to be rejected, *id.* at 513, and the "market value approach is an objective, not a subjective, analysis," *Mackie v. Rieser*, 296 F.3d 909, 917 (9th Cir. 2002); *see also On Davis v. The Gap, Inc.*, 246 F.3d 152, 166 (2d Cir. 2001) ("The question is not what the owner would have charged, but rather what is the fair market value.").

[9] Jarvis' actual damages argument fails because the district court properly based its calculations on objective considerations of market value. The court's findings show that it examined at least six estimates of the fair market value of Jarvis' infringed images: (1) the testimony of Jarvis' expert witness Richard Weisgrau that, assuming rights-managed monthly rates, Jarvis' images were worth $1,500 to $5,000

---

[7]Rights-managed images are typically licensed for a specific use and a limited duration, with the price varying based on the intended use. Royalty-free images, in contrast, allow a wider range of uses for a single initial fee. Rights-managed images are typically higher quality and more expensive than royalty-free images and allow exclusive use by the licensor.

each; (2) the testimony of a senior K2 executive that he would pay $5-20 for an image to be used online and $500-750 for a glossy high-definition image for a print advertisement or magazine cover; (3) Jarvis' compensation of $10,000 for the 2,516 images he delivered to K2 under the 2000 Agreement; (4) Jarvis' compensation of $7,200 for the 1,210 images he delivered to K2 under the 2001 Agreement; (5) Jarvis' compensation of $3,000 for seven images he delivered to K2 in 2001; and (6) Jarvis' settlement offer of $15,520 for all images infringed by K2. Although these estimates informed the district court's calculations, it ultimately cited *Jarvis' own damages figures* for images used in print and then halved the average of these figures to determine the damages per online use. The court based its halving on its finding that "the fair market value of an online use is less than the average fair market value of a print use." This methodology produced a damages figure of $461 per online use, a figure below Weisgrau's estimate but well within the range of the other five estimates.

**[10]** We believe that the district court's calculations were entirely consistent with § 504(b) and the case law. The court's inquiry was objective, avoiding references to what Jarvis thought he should have earned or wished he had charged. The court also examined the financial perspectives of both the willing buyer (in the form of evidence about what K2 typically pays for images and what it specifically paid Jarvis in its prior dealings with him) and the willing seller (in the form of Jarvis' earlier deals with K2 and his revenue from image databanks) at the hypothetical time of sale.[8] Furthermore, the

---

[8]Jarvis claims that the district court ignored the willing seller half of the equation. However, four of the estimates cited by the court involved Jarvis as seller or would-be seller. Jarvis also argues that the 2000 and 2001 Agreements covered photographic shoots rather than the granting of licenses. This is incorrect because the contracts also set forth in considerable detail the terms of K2's use of Jarvis' images. Moreover, Jarvis himself states in his briefing that "[t]he subject matter" of the Agreements "was personal services *and a license*" (emphasis added).

court gave logical reasons why it discounted Weisgrau's testimony; according to the court, he "relied almost exclusively on the Getty website for his figures and unrealistically used a monthly licensing fee as the basis for his valuations."[9] Finally, the figure the court adopted was near the center of the range supported by the evidence. *Cf. Duckett v. Godinez*, 109 F.3d 533, 535 (9th Cir. 1997) (" 'Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous.' ") (quoting *Anderson v. Bessemer City*, 470 U.S. 564, 574 (1985)).

Jarvis argues, in essence, that it was clear error for the district court not to adopt Weisgrau's assumptions of rights-managed fees paid monthly. But, as the court found, monthly prices are not particularly relevant since the annual price is only about twice as high; "any reasonable business person" — and particularly a company that updates its web content only once a year — "would pay to license the image[s] on a yearly basis rather than a monthly basis." Jarvis' policy argument about deterring infringers by charging them the higher price is also unsupported by the statutory text or by the case law's emphasis on fair market value at the time of the infringement. Making the plaintiff whole is plainly different from punishing the infringer by charging the highest possible rate for the infringement. *See Stehrenberger v. R.J. Reynolds Tobacco Holdings, Inc.*, 335 F. Supp. 2d 466, 468 (S.D.N.Y. 2004)

---

[9]Weisgrau's $1,500 to $5,000 estimate also did not represent "what a willing buyer would have been reasonably required to pay to a willing seller," *Frank Music Corp.*, 772 F.2d at 512 (internal quotation omitted), but rather what K2 should have paid Jarvis *after* its infringement. As Weisgrau testified, his estimate was based on the likely outcome if K2 "tried to make a deal after [it had] infringed" and Jarvis saw that a photo of his "was a proprietary image, that it had their logo, that it had a greater value for them." In that case, Jarvis and K2 "would have negotiated a higher fee." This legally defective emphasis on post-infringement damages rather than the pre-infringement fair market value of Jarvis' images provided the district court with another compelling reason to discount Weisgrau's testimony.

(criticizing effort to inflate actual damages and stating that the effort "represents concepts of punishment for infringement, deterrence of similar behavior in the future, and recompense for the costs and effort of litigation" that "form no part of 'actual damages' under the statute").

The rights-managed versus royalty-free issue is more difficult, but we need not resolve it here for two reasons. First, the district court did not clearly embrace royalty-free pricing in its decision. The district court did opine that such pricing is more appropriate for assessing online uses of images, but the court's actual methodology was to consider the various estimates of the images' worth, to accept Jarvis' figures for the fair market value of the print uses and then to halve these figures in order to calculate damages for the online uses. The court did not cite any evidence about royalty-free prices, let alone use such evidence in its own calculations. Second, the court's $461 figure for online uses was consistent with *both* royalty-free and rights-managed pricing. Weisgrau testified that one-year rights-managed licenses for Jarvis' images cost $440 to $615 on the open market, and the nine rights-managed licenses that Jarvis actually sold for online use had prices ranging from $41.19 to $595.

**[11]** We therefore hold that the district court's actual damages award for K2's copyright infringement was not clearly erroneous. However, we take no position on whether royalty-free or rights-based pricing is the appropriate method for determining actual damages in this and other similar cases, and we do not approve any implied endorsement of royalty-free pricing by the district court.

### 2. Unreturned Images

Jarvis also challenges the district court's $199,000 damages award for the 396 images that K2 failed to return to him. This award was based on a $500 loss estimate for each of the 395 unidentified slides and a $1,500 loss estimate for one slide

that was the subject of correspondence between Jarvis and a K2 Bike employee. Jarvis argues that the 2000 and 2001 Agreements were only partially integrated, not, as the district court found, fully integrated. As a result, Jarvis contends that the provision in his delivery memos stating that K2 must reimburse him $1,500 for each lost slide is contractually binding on K2.

**[12]** Whether a contract is integrated is a factual question reviewable for substantial error. *See Sierra Diesel Injection Serv.*, 890 F.2d at 112. The trial court "must hear all relevant, extrinsic evidence, oral or written," and determine whether the parties intended the contract to be the "final and complete expression of the parties' agreement." *Emrich v. Connell*, 716 P.2d 863, 866 (Wash. 1986). If a contract is fully integrated, it may be modified only by a writing signed by both parties. Wash. Rev. Code § 62A.2-209(2).

Here the district court specifically found that the 2000 and 2001 Agreements were "fully integrated contract[s] that could not be modified except by a writing signed by both parties." In making this finding, the court emphasized the language of the contracts, the last clause of which stated that "[t]his Agreement constitutes the *entire agreement* of the parties as to the subject matter hereof. This Agreement *may only be modified in writing* signed by the parties hereto" (emphasis added). The integration clause is not dispositive but it certainly suggests that Jarvis and K2 intended the contracts to be fully integrated. *See M.A. Mortenson Co. v. Timberline Software Corp.*, 998 P.2d 305, 311 (Wash. 2000) ("The presence of an integration clause strongly supports a conclusion that the parties' agreement was fully integrated.") (internal quotation omitted). The court also heard Jarvis' testimony that he never discussed the $1,500 reimbursement figure with anyone at K2 before signing the 2000 Agreement. This statement indicates that there was no separate agreement about lost slides before the 2000 Agreement was signed, thus bolstering

the district court's conclusion that the contracts were fully integrated.

Jarvis' strongest argument to the contrary is a subclause in both Agreements stating that "[f]or additional terms and conditions standard to the photographic image industry consult Jarvis, licensor." The district court explicitly cited this subclause and concluded that the contracts were fully integrated despite it — a determination that is entitled to some weight given the factual nature of the integration inquiry. Moreover, the subclause neither stated what the "additional terms and conditions" were nor indicated that the parties planned to reach a binding agreement about them. That the subclause directed K2 to consult Jarvis about these industry standards — apparently, at its discretion and without any requirement that it agree to them — does not mean that the parties intended their written contracts to be anything less than the "final and complete expression of [their] agreement." *Emrich*, 716 P.2d at 866.

**[13]** Jarvis also emphasizes the words "as to the subject matter hereof" in the integration clause. But there is no evidence that, as he contends, the parties understood this term as limiting the Agreements' scope to "personal services and a license" and thus excluding the slides that were central to the entire contractual arrangement. This contention is particularly implausible given the Agreements' references to "film generated" from Jarvis' shoots and "all viewable renditions furnished by Chase Jarvis . . . whether captured or stored in photographic, magnetic, optical, or any other medium." Finally, Jarvis points out that the Agreements did not mention the slides' delivery, the penalty for losing them or all the photographic shoots that Jarvis would carry out. However, the Agreements did refer to the "date of delivery" of the slides as well as to some of Jarvis' shoots. Moreover, that a contract does not cover all issues that eventually arise between two parties does not mean that the parties did not intend the contract to be fully integrated when they signed it. Taking into

account the relevant record, we agree with the district court that the best reading of the Agreements is that they were meant to be "final and complete," but that, as often happens, they failed to plan for the unfortunate turns that the parties' relationship eventually took. Accordingly, the district court's finding that the Agreements were fully integrated was not clearly erroneous.

Jarvis does not specifically challenge the court's loss estimate of $500 per unreturned slide so we need not decide whether that estimate was reasonable. We also need not consider Jarvis' argument, based on Wash. Rev. Code § 62A.2-207, that the terms in the delivery memos became binding when K2 accepted the images without objecting to the memos' terms. This argument would be applicable only if the Agreements were not fully integrated and hence modifiable only by a writing signed by both parties. Finally, Jarvis' counsel conceded at oral argument that it is impossible to determine which, if any, of the unreturned images came from shoots conducted prior to the entry of the Agreements. We therefore need not decide whether Jarvis' § 62A.2-207 argument applies to those particular images. Were the argument to apply, neither we nor the district court would have any way of calculating the number of unreturned images from shoots conducted before the Agreements and the corresponding damages.[10]

## 3. Failures To Credit

Finally, Jarvis objects to the $11,400 in damages that he was awarded because of K2's 105 failures to credit him in various images and one miscredit to another photographer. Jarvis argues that the district court's loss estimates of $50 per

---

[10]We also note that approximately 90 percent of the images that Jarvis delivered to K2 were produced under the 2000 and 2001 Agreements. The number of unreturned slides from shoots conducted prior to the Agreements was thus in all likelihood quite small.

online failure to credit and $200 per failure to credit in print were too low and did "not come close to compensating [him] for lost business opportunities."

**[14]** The district court's damages calculations for the failures to credit Jarvis were based on reasonable assumptions and logic. Noting that Weisgrau "[could not] estimate the actual value of a missing credit in print or on the web," the court subdivided the failures to credit by medium (online, vehicle wrap, print and media). The court then found that "[m]any of the images for which Mr. Jarvis did not receive credit are very small images which appeared online." The court added that "[i]t is difficult to make out the content and quality of these images" and that "[m]any of these images are simply filler on a webpage, and a photo credit for such images would have little, if any, value." Images that are mainly located online and "are very small and difficult to identify[ ] would yield little in the way of new work for Mr. Jarvis." Taking these considerations into account, the court set the reasonable value of a failure to credit at $50 for online uses, and up to $300 for other media. These estimates, made in the wake of Jarvis' inability to provide any evidence about business he lost due to failures to credit him, were eminently sensible and hence not clearly erroneous.

Jarvis contends that he should have received the alleged industry standard of three times his license fee for each failure to credit (and four times his license fee for the one miscredit). Based on K2's 105 failures to credit as well as Jarvis' license fee of at least $1,500 per image, this methodology would have entitled Jarvis to nearly $500,000 — an amount that dwarfs his actual compensation from K2 and other clients. Jarvis further notes that his most popular images produce large amounts of royalties each year. The royalty data do not, however, imply that the uncredited images would have produced an average of $4,500 each in revenue but for the failure to credit, and indeed the notion is implausible. As the district found, the vast majority of the uncredited images had "little,

if any, value." Finally, Jarvis objects to the lower rate set by the district court for online failures to cite. But this lower rate was reasonable given the small size, poor quality and non-trivial editing of most of the online images, as well as their juxtaposition in many cases with other photographers' images and marketing graphics.

**[15]** We therefore hold that the damages awarded by the district court for K2's failures to credit and miscredit were not clearly erroneous.

## IV.  CONCLUSION

We affirm in part and reverse in part the district court's judgment and remand for further proceedings consistent with this opinion. We reverse the district court's finding that the collage advertisements were privileged under § 201(c), but otherwise affirm the damages the court awarded to Jarvis because of K2's copyright infringements, losses of slides and failures to credit. On remand, the district court should determine what actual and statutory damages Jarvis is due for the 24 infringing images contained in the collage advertisements. The court should also address attorney's fees and determine whether K2 willfully infringed Jarvis' copyright in any of the images whose infringement commenced after their registration.

The parties shall bear their own costs on appeal.

**AFFIRMED IN PART AND REVERSED IN PART; REMANDED.**