**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| AQUARIAN FOUNDATION, INC., A Washington nonprofit corporation, | No. 22-35704 |
| *Plaintiff-Appellant*, | D.C. No. 2:19-cv-01879-RSM |
| v. | |
| BRUCE KIMBERLY LOWNDES, AKA Sankacharya Sunkara, | OPINION |
| *Defendant-Appellee*. | |

| | |
|---|---|
| AQUARIAN FOUNDATION, INC., A Washington nonprofit corporation, | No. 22-35729 |
| *Plaintiff-Appellee*, | D.C. No. 2:19-cv-01879-RSM |
| v. | |
| BRUCE KIMBERLY LOWNDES, AKA Sankacharya Sunkara, | |
| *Defendant-Appellant*. | |

Appeal from the United States District Court
for the Western District of Washington
Ricardo S. Martinez, District Judge, Presiding

Argued and Submitted August 20, 2024
Seattle, Washington

Filed February 3, 2025

Before: Michael Daly Hawkins, M. Margaret McKeown, and Ana de Alba, Circuit Judges.

Opinion by Judge McKeown

## SUMMARY[*]

### Copyright

The panel affirmed in part and reversed in part the district court's judgment in favor of defendant Bruce Lowndes after a bench trial in a copyright action brought by Aquarian Foundation, Inc.

Aquarian, a non-profit religious organization, alleged infringement of copyrights in the spiritual teachings of Keith Milton Rhinehart, its late founder and ecclesiastical head, when Lowndes uploaded works to various websites. Lowndes claimed that he obtained a license from Rhinehart in 1985, before Rhinehart died in 1999 and bequeathed his estate to Aquarian. Granting partial summary judgment, the district court concluded that Rhinehart, via his will, properly transferred his copyrights to the church after his death. After a bench trial, the district court ruled against Aquarian on its claims of copyright infringement, trademark infringement, and false designation of origin.

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

The panel affirmed the district court's holdings that: (1) Rhinehart created his teachings not as works for hire, but under the auspices of his own authorship, under both the 1909 Copyright Act and the 1976 Copyright Act; (2) Rhinehart licensed his works to Lowndes in 1985; (3) Lowndes did not breach the licensing agreement; and (4) upon Rhinehart's death in 1999, ownership in the underlying copyrights transferred to Aquarian via will. The panel also affirmed the district court's decision not to award Lowndes attorneys' fees under the Lanham Act.

The panel, however, reversed the district court's determination that, under 17 U.S.C. § 203(a), Aquarian did not terminate the Rhinehart license in a letter from the church's counsel in May 2021. The panel held that § 203's requirements for terminating copyright licenses relate to authors and statutory heirs and had no bearing in a case like this one, where Aquarian was not a statutory heir and came into Rhinehart's copyrights by will. The panel remanded for further proceedings concerning any infringement that may have occurred after license termination on May 7, 2021, as well as the denial of injunctive relief and attorneys' fees under the Copyright Act.

## COUNSEL

Tim J. Billick (argued), TBillick Law PLLC, Seattle, Washington; Henry J. Fasthoff IV, Fasthoff Law Firm PLLC, The Woodlands, Texas; for Plaintiff-Appellant.

Bradley S. Wolf (argued) and Christine L. Becia, Bauman & Wolf PLLC, Tacoma, Washington, for Defendant-Appellee.

# OPINION

McKEOWN, Circuit Judge:

Copyright, estate law, and religious writings make for strange bedfellows, but this appeal has them all. It concerns the ownership, licensing, and claimed infringement of copyrights in the spiritual teachings of Keith Milton Rhinehart, late founder and ecclesiastical head of the Aquarian Foundation, a non-profit religious organization. At issue are 177 copyrighted manuscripts, sound recordings, and audio-visual materials registered between 1958 and 2007, along with 44 of what Aquarian characterizes as "Proprietary Works" for the church and its members. Titles range from "Link Your Mind with God," to "The Magnificent Materialization," to "How to Protect a Séance or a Person's Aura from Attack by Earthbound Entities."

Aquarian brought suit after its leadership discovered that Bruce Lowndes, an active member of Aquarian from the 1970s until 1997, had uploaded copyrighted works to various websites. Lowndes claims that he obtained a license from Rhinehart in 1985, before the church leader died in 1999 and bequeathed his estate to Aquarian via will. Aquarian, in addition to challenging the validity of that license, insists that the license was terminated by Lowndes's breach of the licensing agreement or, at the very latest, in a letter from the church's counsel in May 2021.

The district court first addressed Aquarian's current ownership of the underlying copyrights. In response to dueling motions for partial summary judgment, it concluded that Rhinehart, via his will, properly transferred his copyrights to the church after his death in 1999. Then, after a three-day bench trial, the court ruled against Aquarian on

its claims of copyright infringement, trademark infringement, and false designation of origin. The court reasoned that copyright ownership initially vested in Rhinehart, not Aquarian, because Rhinehart authored the works outside the work-for-hire doctrine. As to the license, the court found that Lowndes had a valid license from Rhinehart to use the copyrighted materials; that Lowndes did not breach the license agreement; and that Aquarian lacked the authority to terminate the license under 17 U.S.C. § 203(a). The court denied attorneys' fees to both parties.

On appeal, Aquarian challenges the district court's rulings on the ownership of the copyrights and the efficacy and termination of the license. In his cross- appeal, Lowndes challenges the partial summary judgment ruling on Aquarian's ownership of the copyrights, as well as the denial of attorneys' fees.

We affirm in part and reverse in part. Like the district court, we hold that Rhinehart created his teachings not as works for hire but under the auspices of his own authorship; Rhinehart licensed his works to Lowndes in 1985; Lowndes did not breach the licensing agreement; and upon Rhinehart's death in 1999, ownership in the underlying copyrights transferred to Aquarian via will. We also affirm the decision not to award Lowndes attorneys' fees under the Lanham Act.

We depart, however, from the district court's determination that, under 17 U.S.C. § 203(a), Aquarian did not terminate the Rhinehart license. Section 203's requirements for terminating copyright licenses relate to authors and statutory heirs and have no bearing in a case like this one, where Aquarian is not a statutory heir and came into Rhinehart's copyrights via will. Because we reverse on the

termination of the license, we remand for further proceedings concerning any infringement that may have occurred after May 7, 2021, as well as the denial of injunctive relief and attorneys' fees under the Copyright Act.

## FACTUAL BACKGROUND

Keith Rhinehart founded the Aquarian Foundation in Seattle in 1955. According to the organization's articles of incorporation, its mission includes the operation and maintenance of a church; the public worship and study of its syncretic religious principles (*i.e.*, in "Modern Spiritualism, Christianity, Eastern and Metaphysical Thought"); and, for the purposes of this case, the publication and broadcast of promotional materials "by radio, television and any other available means."

Rhinehart was an employee of Aquarian from its founding until his death in 1999, occupying roles as secretary of the board of directors and president. Throughout his tenure, he produced many pamphlets and recordings of his sermons, lectures, and other religious materials. The bulk of these works were created in the 1970s and 1980s, and of those registered with the Copyright Office, virtually all were issued certificates with Rhinehart as the named author and a disclaimer that they were not works for hire. The parties have identified only two works that were registered jointly in the names of Rhinehart and Aquarian. What's more, Aquarian's current president and ecclesiastic head, Jannifer Werner, submitted a declaration to the district court representing that "[a]ll published and unpublished works were required to be copyrighted in Rev. Rhinehart's name while he was alive so that Rev. Rhinehart as the author of the materials could maintain the integrity of the works and make publication decisions."

Lowndes became a member and participant in Aquarian's religious activities during the 1970s. He grew close with Rhinehart and assisted him in starting various reading groups in Colorado, Nevada, and California. On June 9, 1985, in anticipation of "a coming World Wide Network yet to be created," Rhinehart executed an agreement granting Lowndes "unrestricted Permission to use any Materials I have Copyrighted." Lowndes later began transferring and converting recordings of Rhinehart into digital format. Lowndes collected these materials by taking them from open tables at religious gatherings and receiving them from Aquarian upon request.

Lowndes relocated to his native Australia in the mid-1990s, where he still resides. He was excommunicated from Aquarian in early 1997 for reasons unrelated to the present dispute, though he asserts he did not know of this status before this lawsuit. Rhinehart died a few years later, in 1999. He had no surviving spouse or children, and his last will and testament made a residual bequest of his estate—"whether real or personal, and wheresoever situated"—to the Aquarian Foundation. Rhinehart's will was deemed valid during the probate process; his executor transferred the copyright interests to Aquarian; and the church filed an acknowledgement of receipt with the probate court. The estate was administratively closed in 2007.

By 2014, Werner discovered that Rhinehart's sermons were appearing online, so Aquarian sent Lowndes hundreds of takedown requests pursuant to the Digital Millennium Copyright Act (DMCA), 17 U.S.C. § 512. Aquarian sued Lowndes five years later. In the course of the litigation, on May 7, 2021, Aquarian's counsel sent Lowndes a cancellation letter purporting to immediately extinguish any outstanding rights created by the 1985 Rhinehart license.

ANALYSIS

## I.  Infringement

"[C]opyright infringement requires (1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original." *Great Minds v. Office Depot, Inc.*, 945 F.3d 1106, 1110 (9th Cir. 2019) (internal quotation marks omitted). Even where both criteria are met, an otherwise valid infringement claim fails "if the challenged use of the work falls within the scope of a valid license." *Id.* Thus, we first determine whether Rhinehart or Aquarian owned the copyrights. Then, we assess the validity of Rhinehart's license and when—if ever—it was terminated.

### A.  Ownership – Copyrighted Materials Were Not Works for Hire

Aquarian urges that it came into ownership of the copyrighted materials when Rhinehart made them as works for hire as an employee of the church. However, the church can point to no witness contravening Werner's testimony that "published and unpublished works were required to be copyrighted in Rev. Rhinehart's name" so he could "maintain the integrity of the works and make publication decisions." This statement strongly suggests that Rhinehart was not merely a traditional employee or functionary of Aquarian. We agree with the district court that Rhinehart's copyrighted compositions were not made as works for hire under the 1909 or the 1976 Copyright Acts.

As a preliminary matter, we note that the registration certificates naming Rhinehart as author are themselves evidence in favor of the copyrighted materials not being works for hire. The Copyright Act provides that "[i]n any judicial proceedings the certificate of a registration made

before or within five years after first publication of the work shall constitute prima facie evidence of the validity of the copyright and of the facts *stated in the certificate*." 17 U.S.C. § 410(c) (emphasis added). Even for those copyrights where the registration certificate is issued more than five years after the publication, "the evidentiary weight to be accorded to the certificate of registration shall be within the discretion of the court." *Enter. Mgmt. Ltd., Inc. v. Construx Software Builders, Inc.*, 73 F.4th 1048, 1057 (9th Cir. 2023) (quoting 17 U.S.C. § 410(c)) (cleaned up). Here, all but two of the copyrights at issue were registered under Rhinehart's name with the explicit designation that they were his copyrights and not works for hire. We credit the district court's determination that these documents constitute evidence of Rhinehart's authorship, not Aquarian's, though we acknowledge that the certificates provide only prima facie, and not definitive, evidence of ownership. *Ent. Rsch. Grp., Inc. v. Genesis Creative Grp., Inc.*, 122 F.3d 1211, 1217 (9th Cir. 1997) (allowing that an accused infringer can rebut the presumption of validity created by a certificate of copyright registration by "offer[ing] some evidence or proof to dispute or deny the plaintiff's prima facie case of infringement").

Even more important, we see no error in the district court's ultimate conclusion that "no credible evidence indicates these were 'works for hire.'" Because some works at issue predate the enactment of the 1976 Copyright Act, we apply the work-for-hire tests of both the 1909 and 1976 Acts. Our inquiry into the work-for-hire status presents "a mixed question of law and fact." *Twentieth Century Fox Film Corp. v. Ent. Distrib.*, 429 F.3d 869, 877 (9th Cir. 2005), *abrogated on other grounds by Rimini St., Inc. v. Oracle USA, Inc.*, 586 U.S. 334 (2019). This standard holds special significance here because the district court found that much of the

testimony at trial lacked credibility.[1] Though we review de novo the district court's interpretations of the Copyright Act, our review of the findings of fact is for clear error. *UMG Recordings, Inc. v. Shelter Cap. Partners LLC*, 718 F.3d 1006, 1014 (9th Cir. 2013) (reviewing de novo interpretation of the Copyright Act); *MDY Indus., LLC v. Blizzard Ent., Inc.*, 629 F.3d 928, 937 (9th Cir. 2010) (reviewing factual findings for clear error). At bottom, Werner's testimony about the organizational mandate to preserve Rhinehart's discretion "as author of the materials" evinces a nonhierarchical relationship between Aquarian and its founder. This relationship, notwithstanding Rhinehart's dual status as an Aquarian employee, does not conform to our work-for-hire tests under either the 1909 or 1976 Copyright Acts.[2]

For works covered by the 1909 Copyright Act, "the presumption arises that the mutual intent of the parties is that the title to the copyright shall be in the person at whose instance and expense the work is done." *Self-Realization Fellowship Church v. Ananda Church of Self-Realization*, 206 F.3d 1322, 1326 (9th Cir. 2000) (quoting *Lin-Brook Builders Hardware v. Gertler*, 352 F.2d 298, 300 (9th Cir. 1965)). Like the Second Circuit, we treat this "instance and expense" test as an inquiry into whether "the motivating factor in producing the work was the employer who induced

---

[1] The district court stated that it "lacked significant credible testimony of any kind" because "answers during direct and cross examination were often incomplete, inconsistent with other testimony or exhibits, or otherwise indicated evasiveness, exaggeration, or dishonesty."

[2] It is worth noting that the 1909 Copyright Act did not give federal copyright protection to audio recordings. This discrepancy bears little on our legal analysis, since Lowndes's posting of lectures in audio format online could still infringe copyrights in the textual composition.

the creation," as opposed to the creator's "own desire for self-expression." *Id.* (quoting *Playboy Enter., Inc. v. Dumas*, 53 F.3d 549, 554 (2d Cir. 1995)); *see also Twentieth Century Fox Film Corp.*, 429 F.3d at 879. Undertaking this inquiry in the church context, we have held that works authored by the founder and head of a church do not constitute "works for hire" even where the authoring monk served as the church's president and board member, received a stipend, and resided in quarters provided by the church. *Ananda*, 206 F.3d at 1325. We reasoned that courts have ascertained works for hire only where there were "traditional, hierarchical relationships in which the employee created the work as part of 'the regular course of business' of the employer," or, otherwise, where the employer had "the right to control or supervise the artist's work." *Id.* at 1326–27 (quoting Melville B. Nimmer and David Nimmer, *Nimmer on Copyright* § 5.03[B][1][a][i] (1999)). Here, the creation of the works was not part of Aquarian's "regular course of business." Werner herself testified that the church's leader, not the church, would "maintain the integrity of the works and make publication decisions," suggesting that the creation and maintenance of the works was Rhinehart's purview, and not the church's domain. Nor did the record reflect any hierarchical or supervisory relationship between Rhinehart and Aquarian. The works do not qualify as works for hire under the 1909 Copyright Act.

For many of the same reasons, the disputed works covered by the 1976 Copyright Act also do not qualify as works for hire. In accordance with Supreme Court precedent, we apply principles of agency law to determine whether the works in question were "prepared by an employee within the scope of his or her employment." *See Cmty. for Creative Non-Violence v. Reid*, 490 U.S. 730, 738–41 (1989)

(interpreting 17 U.S.C. § 101(1)'s definition of a "work made for hire"). Specifically, we refer to Section 228 of the Restatement (Second) of Agency and its three-pronged test that asks whether a work: (1) "is of the kind the employee is employed to perform"; (2) "occurs substantially within the authorized time and space limits"; and (3) "is actuated, at least in part, by a purpose to serve the employer." *U.S. Auto Parts Network, Inc. v. Parts Geek, LLC*, 692 F.3d 1009, 1015 (9th Cir. 2012) (cleaned up).

Here, while there is no dispute that Rhinehart was an Aquarian employee, nothing in the record indicates that the composition, recording, and discretionary publication of spiritual teachings were work typically expected of his designated employment as "secretary of the board" or "president" at the organization. The district court also cast doubt on whether Rhinehart's lectures were always made in collaboration with Aquarian or sometimes written and recorded with others unaffiliated with the church. The reality is that Aquarian seems more to have been "actuated . . . by a purpose to serve" Rhinehart and his teachings than the other way around. The very fact that the lectures were "*required* to be copyrighted in Rev. Rhinehart's name"—not Aquarian's—evinces a level of control exceeding "the scope of his . . . employment" by the church. Based on the work-for-hire framework, the district court findings, and the record, we conclude that, like the works copyrighted under the 1909 Act, the works copyrighted under the 1976 Act fall outside the work-for-hire doctrine.

## B. Ownership – Transfer of Copyrights to Aquarian

We now turn to the matter of Rhinehart's testamentary transfer of the works to Aquarian after his death in 1999.

Lowndes makes a technical argument that the administrative closure of Rhinehart's estate kept Aquarian from becoming the owner of Rhinehart's copyrights, but the district court had ample evidence that Rhinehart's copyrights were properly bequeathed and distributed to Aquarian as the sole beneficiary named in the will. Both the 1909 and 1976 Copyright Acts allow for the transfer of a copyright by will. 17 U.S.C. § 42 (repealed) (providing that copyrights "may be bequeathed by will"); 17 U.S.C. § 201(d)(1) (providing that that they "may be bequeathed by will or pass as personal property by the applicable laws of intestate succession"). In his capacity as personal representative, Alvis Dunn transferred the copyright interests to Aquarian. Not only did Aquarian confirm its receipt of the copyrights in July 2000, but two orders from the state superior court in Washington reflect that the church had "received all estate assets." Aquarian thus became the owner of the copyrights after Rhinehart's death.

## II. The Rhinehart License to Lowndes

### A. License – Validity and Claimed Breach

At trial, there was much brouhaha about the legitimacy of the license, and the district court was skeptical about the expert-assisted effort to authenticate Rhinehart's signature. In the end, the court found the license valid, noting that "[c]redible testimony and photographs demonstrate that this agreement was created at a time when Mr. Lowndes and Mr. Rhinehart were close acquaintances and Mr. Rhinehart stayed at Mr. Lowndes's residence."

On appeal, Aquarian shifts gears and now claims that Rhinehart lacked the authority to execute licenses without board approval. This argument is misplaced because Rhinehart was the owner of the copyrights in 1985 and he,

not the members of the board, had the authority to grant the license to Lowndes. 17 U.S.C. § 106 (endowing copyright owners "the exclusive rights to do *and to authorize*" the reproduction, distribution, and public performance of a copyrighted work (emphasis added)). Aquarian eventually succeeded to this authority, but not until after Rhinehart's death nearly fifteen years after the initial execution of the license.

Aquarian's fallback argument that Lowndes breached the license fares no better. Lowndes can hardly be faulted for posting copyrighted works online, when the plain language of the license anticipates "a coming World Wide Network" and grants permission to use copyrighted materials "without restriction." Similarly, Aquarian's claim that Lowndes neglected to share donations with the church runs up against the district court's finding that the church "failed to present credible evidence or testimony as to this issue." Lowndes did not breach the license.

## B.  License – Termination

In the last step of our infringement analysis, we consider the dispositive question of whether Aquarian terminated the license in its May 2021 letter to Lowndes. Aquarian may still prevail on its infringement claim if Lowndes continued to use the copyrighted material following the express termination of the license. *See, e.g.*, *Jarvis v. K2 Inc.*, 486 F.3d 526 (9th Cir. 2007) (affirming damages award for infringement because defendant continued to use copyrighted materials after termination of the license agreement). On this issue, we hold that the district court erroneously subjected Aquarian to the Copyright Act's termination requirements for a statutory heir, which Aquarian was not.

Section 203 of the Copyright Act provides that authors or their statutory heirs may terminate a license agreement of unspecified duration thirty-five years from the date of execution, subject to certain "Conditions of Termination." 17 U.S.C. § 203(a) ("[T]he exclusive or nonexclusive grant of a transfer or license of copyright or of any right under a copyright, executed by the author on or after January 1, 1978, otherwise than by will, is subject to termination."). Apart from this section relating to "the author," the statute goes on to provide conditions for transfer by a statutory heir. *Id*. at § 203(a)(2).

We have previously held that this provision preempts state contract law to prevent owners of this termination interest from ending licenses before thirty-five years have passed. *Rano v. Sipa Press, Inc.*, 987 F.2d 580, 585 (9th Cir. 1993). In *Rano* we did not, however, address the situation here. The district court misconstrued Section 203 to mean that this section also preempts non-statutory heir beneficiaries from exercising termination rights. According to this line of reasoning, Aquarian could not properly terminate the license because it lacked the authority and, by statute, had to provide Lowndes "two years advanced notice," in accordance with Section 203(a)(4)(A).

This approach gets Section 203 backwards, missing that the statute's "Conditions of Termination" do not apply to Aquarian precisely because the church is *not* a statutory heir. This plain reading accords with the path that the First Circuit took in interpreting the provision. *See Latin Am. Music Co. v. Am. Soc'y of Composers Authors & Publishers*, 593 F.3d 95, 101 (1st Cir. 2010) ("According to its plain language, [Section] 203 only applies where an author or an author's statutory heirs are terminating the grant."). As in the First

Circuit case, Aquarian "is neither the author nor a statutory heir of the author." *Id*.

Here, because the termination rights of *non-statutory* heirs like Aquarian are not addressed in the Copyright Act, "we rely on state law to fill the gaps Congress leaves in federal statutes." *Scholastic Ent., Inc. v. Fox Ent. Grp., Inc.*, 336 F.3d 982, 988 (9th Cir. 2003) (quoting *Foad Consulting Grp., Inc. v. Musil Govan Azzalino*, 270 F.3d 821, 827 (9th Cir. 2001) (holding that California state law—not Section 203—governed a corporate copyright owner's (and non-statutory heir's) attempt to terminate a licensing agreement)). Fortunately, there is no need to ascertain whether Washington or Colorado contract law governs the Lowndes license, because it is well established in both states that contracts of unspecified duration are terminable at will.[3] Applying this state-law rule, we hold that Aquarian explicitly terminated the Lowndes license via its May 2021 letter to Lowndes—and did so effective immediately. Even if there were a reasonable-notice requirement, as is true in Washington,[4] that requirement would be satisfied either by Aquarian's numerous takedown requests or by its initiation of this lawsuit in 2019.

---

[3] *Robbins v. Seattle Peerless Motor Co.*, 268 P. 594, 594 (Wash. 1928) ("The rule seems to be that, there being no time limit specified in a contract of this kind, it is subject to cancellation at the will of either party."); *Bradley v. Andrews*, 14 P.2d 1086, 1087 (Colo. 1932) ("The contract, being of indefinite duration, could be terminated at any time with or without cause.").

[4] *See Cascade Auto Glass, Inc. v. Progressive Cas. Ins. Co.*, 145 P.3d 1253, 1256 (Wash. Ct. App. 2006) ("[T]he party wishing to terminate the agreement must give reasonable notice to the other party.").

We thus affirm the district court's conclusion that no copyright infringement occurred prior to May 2021, but reverse its holding that the May 2021 letter did not effectively terminate the Lowndes license. Because the record is unclear as to whether Lowndes continued posting copyrighted works online after receipt of the termination letter, we remand for consideration as to infringement after May 7, 2021, and, in turn, whether an injunction or attorneys' fees are warranted under the Copyright Act.

### III. Impeachment Evidence and Lanham Act Attorneys' Fees

In two final matters, Aquarian and Lowndes both levy arguments that the district court abused its discretion during the proceedings below. Aquarian contends that the district court should have considered a recorded phone call in 1966 as impeachment evidence; Lowndes claims that the court should have awarded him attorneys' fees under the Lanham Act. Both arguments fail.

Ordinarily, "Federal Rule of Evidence 607 allows the admission of extrinsic evidence to impeach specific errors or falsehoods in a witness's testimony on direct examination." *United States v. Antonakeas*, 255 F.3d 714, 724 (9th Cir. 2001). However, Aquarian's challenge fails outright because the court found that it "lacked significant credible testimony of any kind"—including from Lowndes. Impeachment of Lowndes was unnecessary. By explicitly stating that it was "largely unable to rely on the testimony of witnesses when it would be necessary to prove a claim or defense," the court confirmed that it did not rely on Lowndes's testimony in reaching its judgment. Simply put, the exclusion of evidence impeaching his testimony was superfluous and cannot have prejudiced Aquarian in any way.

We can also do away with Lowndes's argument for attorneys' fees under the Lanham Act, even though we leave the question of attorneys' fees under the Copyright Act for the district court on remand. Section 35(a) of the Lanham Act provides that a court "in exceptional cases may award reasonable attorney fees to the prevailing party." 15 U.S.C. § 1117(a). According to the Supreme Court, "an 'exceptional' case is simply one that stands out from others with respect to the substantive strength of a party's litigating position (considering both the governing law and the facts of the case) or the unreasonable manner in which the case was litigated." *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 572 U.S. 545, 554 (2014). Lowndes presented no convincing evidence that Aquarian "vindictively" pursued a baseless claim of trademark infringement. Aquarian showed a reasonable basis to pursue its trademark claim for "higher spiritualism" because both Rhinehart and Aquarian had been using the term since the 1970s. Notwithstanding the vitriolic and colorful language from both sides, the district court did not abuse its discretion in declining to award attorneys' fees under the Lanham Act.

The parties shall pay their own fees on appeal.

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**